**MEDICAL DESIGNS, INC.**

v.

**MEDICAL TECHNOLOGY, INC. and Gary Bledsoe**

v.

**MEDICAL DESIGNS, INC. and Floyd Hutson.**

Civ. A. No. CA–4–84–188–AG.

United States District Court,
N.D. Texas,
Fort Worth Division.

Feb. 3, 1992.

John R. Feather, Kent A. Rowland, Vaden, Eickenroht, Thompson & Boulware, Houston, Tex., Gary Shields, Azle, Tex., Arthur Zobal, Woffard, Fails & Zobal, Fort Worth, Tex., Dabney Bassel, Ed Huddleston, Kern A. Lewis, Fort Worth, Tex., Edward J. McIntyre, Jonathan B. Sokol, Gray, Cary, Ames & Frye, San Diego, Cal., for plaintiff Medical Designs, Inc.

L. Dan Tucker, Richard Kirk Cannon, John Vick, Hubbard, Thurman, Tucker & Harris, Dallas, Tex., James A. Cribbs, Cribbs & McFarland, Arlington, Tex., Robert D. Albergotti, Steven R. Smith, Haynes & Boone, Dallas, Tex., for defendant Medical Technology, Inc.

James D. Jordan, Decker, Hardt, Kopf, Harr, Munsch & Dinan, P.C., Dallas, Tex., for defendant Gary Bledsoe.

## MEMORANDUM OPINION

McGLINCHEY, United States Magistrate Judge.

This action was tried before United States Magistrate Judge Alex H. McGlinchey, without a jury, by consent of the parties and pursuant to the March 25, 1991 Order of Reference from United States District Judge, David O. Belew, Jr., [Title 28, United States Code, Section 636(c)], and in accordance with the appellate direction of *Archie v. Christian*, 808 F.2d 1132, 1137 (5th Cir.1987). All post-trial pleadings and proposed findings of fact and law have been filed. The Magistrate Judge has duly considered the testimony and exhibits introduced at trial, all pre-trial and post-trial pleadings, and now finds the following:

*Jurisdiction*

The Court has jurisdiction over this action under Title 35, United States Code, Section 100, et seq. and Title 28, United States Code, Section 1338(a); venue is proper under Title 28, United States Code, Section 1400.

*Parties*

The plaintiff, Medical Designs, Inc., is a Texas corporation. The defendant, Medical Technology, Inc., is a Texas corporation. Individual defendant, Gary Bledsoe, is a former employee and a forty-nine percent (49%) stockholder in Medical Designs, Inc. as well as a founder, Chief Executive Officer and a seven percent (7%) stockholder in Medical Technology, Inc. Third party de-

fendant, Floyd Hutson, is a founder, president and a fifty-one percent (51%) stockholder in Medical Designs, Inc.

*Contentions*

Plaintiff, Medical Designs, Inc. (MDI), asserts Medical Technology, Inc. (MTI) and Gary Bledsoe (Bledsoe) are infringing United States Patent No. 4,407,276 (the '276 patent) entitled "Brace for Articulated Limbs" or both the '276 patent and United States Patent Des. 269,379 (the '379 patent) entitled "Articulated Knee Brace" by selling the following braces: Bledsoe Brace, Bledsoe Post–Op Brace, Bledsoe Colorado Special/Rehab Brace, Bledsoe Brace II, Bledsoe Adjustable Brace, and the Bledsoe Lever–Lock Brace. Plaintiff seeks damages adequate to compensate MDI for infringement, in no event less than a reasonable royalty, attorneys fees, and an injunction against MTI and Bledsoe from further infringement.

MTI asserts the '276 and the '379 patents are invalid under Title 35, United State Code, Sections 102 and/or 103, or in the alternative the '276 and/or '379 patents are unenforceable. MTI further asserts that if the patents are found to be valid and enforceable, MTI and Bledsoe did not infringe the patents.

*Background*

Gary Bledsoe began working initially for Hutson & Associates, Inc., primarily a manufacturers' representative, in late November or early December of 1979 as an independent sales representative. On or about May 19 or 20, 1980 Floyd Hutson and Gary Bledsoe, on behalf of Hutson and Associates, were at Biomet, an orthopedic product company, in Warsaw, Indiana. During a meeting at Biomet, Bledsoe drew for Hutson and Roy Harroff a rough sketch of a leg brace that he described as a hinged knee immobilizer. The sketch for Harroff evolved into the '276 patent. After explaining the concept to Hutson and Harroff, Bledsoe asked Harroff if Biomet could make a prototype from the sketch. Bledsoe was not pleased with the Biomet prototype that was shipped August 30, 1980 and consequently proceeded to fabricate his

own prototypes beginning in October of 1980.

MDI was formed January 1981 for the purpose of developing, manufacturing and selling what became the '276 and '379 knee braces. Bledsoe is the inventor of the '276 and '379 patents. Bledsoe assigned his rights to these inventions to MDI on January 21, 1981 and December 30, 1980 respectively. On April 11, 1982 Bledsoe left MDI. During late April and May of 1982 Bledsoe and others formed MTI. Bledsoe prepared a prospectus for potential investors in MTI in which he stated his belief that the '276 patent would not issue. All claims were initially rejected by the Patent and Trademark Office (PTO) March 2, 1982. The Bledsoe family owns 49% of the stock of MTI; Gary Bledsoe is the owner of 7% of the 49%. MTI was backed by a group of investors including several physicians and others who put up starting capital. These investors hold the other 51% of the stock in MTI.

*Pre–Trial History*

This cause of action was filed May 18, 1984. On July 12, 1984 MTI answered, filed a third-party complaint against Floyd Hutson and counterclaims against MDI urging the court to declare '276 and '379 invalid, unenforceable, not infringed, and to award attorney fees. This case was stayed February 19, 1986, pending a final decision in a related state court case. On March 4, 1987 this case and Civil Action No. CA–4–87–140–E were consolidated. On November 16, 1989 this consolidated case was reopened. Gary Bledsoe was made a party to this action February 15, 1991. On March 25, 1991 this cause of action was referred to United States Magistrate Judge Alex H. McGlinchey for the conduct of all further proceedings and the entry of judgment in accordance with Title 28, United States Code, Section 636(c).

Prior to trial, the court denied motions for summary judgement and a motion in limine, i.e., finding in this case the equitable doctrine of assignor estoppel did not apply.

 Assignor estoppel is an equitable doctrine that prevents an individual and

**618**

those in privity with him from invalidating his own invention. This equitable doctrine is mainly concerned with the balance of the equities between the parties. *Shamrock Technologies v. Medical Sterilization,* 903 F.2d 789 (Fed.Cir.1990) *citing Diamond Scientific Co. v. Ambico, Inc.,* 848 F.2d 1220, 1224 (Fed.Cir.1988) *cert. dismissed,* 487 U.S. 1265, 109 S.Ct. 28, 101 L.Ed.2d 978 (1988). The four primary justifications for applying assignor estoppel are (1) to prevent unfairness and injustice; (2) to prevent one from benefiting from his own wrong; (3) by analogy to estoppel by deed in real estate; and (4) by analogy to a landlord-tenant relationship. *Diamond Scientific Co.,* 848 F.2d at 1224. In this case the application of assignor estoppel would allow MDI and Hutson to benefit from MDI's wrongdoing, proceeding with their patent application without calling to the attention of the PTO examiner material prior art. It would be unjust and unfair to apply assignor estoppel to Bledsoe and MTI because neither has done any wrong in connection with the '276 or '379 patents in suit.

In a proper case general principles of equity may preclude use of assignor estoppel to bar a viable equitable defense arising from post-assignment events. *Buckingham Prods. Co. v. McAleer Mfg. Co.,* 108 F.2d 192, 195 (6th Cir.1939).

This court previously ruled MTI and Bledsoe are not barred by the equitable doctrine of assignor estoppel because of the post-assignment activities of Charles McHugh, the patent attorney who prosecuted the '276 and '379 patents. Bledsoe and MTI are not profiting from their own fraud.

*Trial Proceedings*

At the close of Plaintiff's case in chief, this court granted judgment in favor of defendant, Gary Bledsoe, on all of Plaintiff's claims against Gary Bledsoe individually. The final judgment was signed and filed by the court on November 26, 1991. Bledsoe remained in this case to assert his counterclaims against MDI and Hutson.

VALIDITY OF THE '276 PATENT

■ A patent is presumed valid as to each claim. Each claim of a patent shall be presumed valid independently of the validity of the other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. 35 U.S.C. § 282. The burden of proof is on the party challenging validity to prove the facts establishing invalidity by clear and convincing evidence. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1360 (Fed.Cir.1984), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). The Patent and Trademark Office is due the deference given a qualified government agency: the presumption of having properly done its job. *Id.* at 1359. However, there is no reason to defer to the Patent and Trademark Office so far as its effect on validity is concerned when an attacker produces prior art or other evidence not considered in the Patent and Trademark Office. This does not effect the burden of proof as to validity, only as to the deference due the Patent and Trademark Office. *Id.* at 1360.

MTI and Bledsoe have cited as prior art an invention of 3D Orthopedics, Inc. which they deem to have been more pertinent than any of the art before the examiner of the Patent and Trademark Office.

*Anticipation*

Defendants MTI and Bledsoe argue that all the claims of the '276 patent were anticipated by the prior art and therefore not patentable under 35 U.S.C. § 102. MTI and Bledsoe argue that the '276 patent is not novel because the 3D invention suggested the claims of the '276 patent to those skilled in the art.

"Under 35 U.S.C. § 102, anticipation requires that each and every element of the claimed invention be disclosed in a prior art reference. In addition, the prior art reference must be enabling, thus placing the allegedly disclosed matter in the possession of the public." *Akzo N.V. v. U.S. Int'l Trade Comm.,* 808 F.2d 1471, 1479 (Fed. Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987).

The '276 patent issued for a device designed to replace conventional rigid casts. This device is assembled element-by-element onto the wearer's leg. Once fitted, the brace externally supports the leg during healing while allowing a preset controlled degree of movement or immobilization of the limb as directed by the prescribing physician. The actual claims of the '276 patent read as follows:

1. An external bracing apparatus for controlling the degree of motion which is permitted to a person's knee, comprising:

(a) first and second flexible sheet of cushioned material, one of which is adapted for snugly wrapping around the wearer's thigh and the other being, adapted for snugly wrapping around the wearer's calf, and the width of each sheet being sufficient to circumferentially envelope at least most of its associated leg member, and the length of each sheet being sufficient to encompass more than half of length of the respective leg member, and said flexible sheets being selectively removable and replaceable around the wearer's leg members;

(b) first and second pairs of elongated braces which are adapted to be connected by hinge means, each of the braces being relatively stiff so as to resist both torsion an bending loads, and the first pair of elongated braces being adapted to lie on opposite sides of the wearer's thigh and the second pair of elongated braces being adapted to lie on opposite sides of the wearer's calf;

(c) attachment means carried by said first and second pairs of braces for adjustably positioning and selectively attaching the first and second pairs of elongated braces to attachment means the exterior sides sheets after said sheets have been wrapped around their associated leg member;

(d) hinge means attached to respective ends of the wearer's leg, and said hinge means being effective for controlling the angle that is formed by the two braces on a given side of the wearer's leg; and

(e) a plurality of non-elastic straps which are selectively attachable to the outside surface of said braces and which are adapted to be wrapped circumferentially around the wearer's leg members, and said straps having connecting means so that they may be placed in tension around the wearer's leg and secured to the elongated braces.

2. The external bracing apparatus as claimed in claim 1 wherein at least a major portion of the exterior surface of the first and second flexible sheets consists a soft pile-type material which is capable of being engaged and held by a plurality of resilient hooks, and wherein a substantial portion of the inside of the surfaces of the pairs of elongated braces have affixed thereto pads of resilient hooks, such that the elongated braces may be selectively positioned at essentially any appropriate place on the sides of the flexible sheets by engaging the resilient hooks with the sheets after said sheets are wrapped around a respective leg member, and wherein the connecting means associated with the non-elastic straps constitutes a soft pile-type material fixed to the interiorly facing surfaces of the straps, and there being pads of exteriorly facing resilient hooks permanently affixed to the elongated braces, whereby the straps are adapted to be secured to the elongated braces by manually forcing together the confronting resilient hooks and pile-type material.

3. The external bracing apparatus as claimed in claim 1 wherein each of the elongated braces consist of a structural core enveloped in a non-metallic protective sheath, and the structural cores being permanently bonded to their associated sheaths, whereby the structural cores may be held in a supportive position adjacent the leg members by virtue of securely holding their associated sheaths.

4. The external bracing apparatus as claimed in claim 1 wherein the plurality of non-elastic straps are permanently anchored to their respective flexible sheets near a mid-point of said straps, whereby each strap has an interior connection of its sheet and has two free ends which are selectively engageable to hold the sheet around its leg member.

5. The external bracing apparatus as claimed in claim 1 and further including a plurality of temporary positioning tabs made of resilient hook material affixed to a side edge of each of the flexible sheets, and said tabs being selectively engageable with the exterior surface of their associated sheets, and said tabs being effective a hold a respective sheet in place around an associated leg member while the elongated braces and non-elastic straps are being manually positioned at proper places in order to complete the installation of the apparatus on the wearer's leg.

6. The method of affixing an external brace to a person in order to affect the degree of motion which can be permitted to a person's knee, comprising;

(a) initially wrapping first and second flexible sheets of cushioned material around the wearer's leg members, with on of the flexible sheets circumferentially enveloping most of the wearer's calf and the second flexible sheet circumferentially enveloping most of the wearer's thigh, and securing said first and second sheets so they are held in place around their respective leg members;

(b) subsequently positioning and then selectively attaching first and second pairs of elongated braces to the exterior sides of respective ones of the first and second flexible sheets after said sheets have been wrapped around their associated leg members, and the two braces on a given side of the wearer's leg members being respectively connected with a hinge which is adapted for affecting the degree of motion that is realizable by a wearer's knee, and the positioning of said elongated braces being such as to properly locate the two hinges with respect to the wearer's knee; and

(c) wrapping a plurality of non-elastic straps circumferentially around the flexible sheets on the wearer's leg member, and placing the straps in tension so as to closely envelop the respective flexible sheets and their associated elongated braces, and attaching said tensioned straps to the outside surface of the elongated braces, whereby the elongated braces are secured against unwanted movement by being attached to their inside surfaces to the flexible sheets and attached on their outside surfaces to the non-elastic straps.

7. The method of affixing an external brace to a person as claimed in claim 6 wherein each of the flexible sheets has an external pile surface and at least one tab of resilient hook material affixed to a side edge thereof, and wherein the flexible sheets are initially secured around their respective leg members by wrapping the sheets in such a way that the tabs of resilient hook material remain exposed, and then pressing said exposed tabs against the exterior pile surfaces in order to cause the hook to engage the pile surfaces, whereby the flexible sheets may conform to the shape of essentially any leg member and easily held in place therearound.

8. The method of affixing an external brace to a person as in claim 6 and including the further step of initially applying an ankle cuff of cushioned material around the wearer's ankle before the lower flexible sheet is wrapped around the wearer's calf, whereby any tendency of the lower flexible sheet to slide downward during walking is inhibited by the presence of the ankle cuff.

Medical Technologies, Inc. and Bledsoe assert the 3D rehabilitative brace system is prior art that invalidates the '276 patent.

The 3D brace system, it was universally agreed, is prior art not brought to the attention of the PTO examiner during the prosecution of the '276 patent.

3D Orthopedics, Inc. was a Texas corporation founded by Dr. Richard Jones, Dr. Donald Mauldin and Donald Lambert in December of 1980 to market and sell devices that Mauldin and Jones developed and patented in the orthopedic field. When the 3D brace was developed, Dr. Richard Jones was a full-time faculty member and professor of orthopedic surgery at the University of Texas Health Science Center in Dallas, Texas, also known as the Southwestern Medical School, chief of orthopedic surgery at the Veterans' Administration Hospital

(VA Hospital), as well as engaging in private practice. Donald Mauldin is a former student of Dr. Jones and became a partner in private medical practice with Dr. Richard Jones. Donald Lambert was the Dallas representative of Depuy, a division of Bio–Dynamics, Inc., Warsaw, Indiana. Drs. Mauldin and Jones bought out Lambert early in 3D Orthopedics, Inc.'s existence. At the time the 3D brace was invented, Dr. Earl Smith[1] was a member of the faculty at the Southwestern Medical School. 3D Orthopedics, Inc. was sold about September 1989 to Orthopedic Acquisition Corporation, c/o DeRoyal, Inc., 200 DeBusk Lane, Powell, Tennessee.

The 3D leg brace system was first invented in the summer of 1979. Dr. Mauldin, testifying by deposition, described the invention in great detail. The 3D invention consists of separate velfoam thigh and calf cuffs with the pile aspect of velcro in that the exterior of the velfoam could be adhered to directly. The cuffs are applied by snugly wrapping the velfoam material to its respective area of the leg, allowing the overlap to be selectively secured by velcro means to the underlying portion.

Once the cuffs are in place, the medial and lateral brace elements are selectively positioned to allow the hinges to align with the patient's knee, thus insuring the correct axis of motion. The brace elements are intended to give rigid support of the leg. They are selectively attached to the exterior of the velfoam cuffs by velcro tabs affixed to the interior of the brace elements. The brace elements are held in place by the velcro means of attachment until secured by the circumferential straps. This plurality of straps is intended to be tensioned around the brace elements and velfoam cuffs to ensure they are held properly in place to perform their functions. Elastic and non-elastic straps were interchanged in the 3D invention.

Melvin Stills, the orthotist who fabricated most of the 3D brace systems, testified by deposition that the braces he made for 3D before the February 26, 1981 Las Vegas Convention of American Academy of Orthopedic Surgeons (AAOS) had velfoam flexible sheets for the thigh and calf portion of the leg, velcro tabs that fastened the velfoam sheets, uprights connected by a hinge, and circumferential straps that attached selectively to the velfoam exterior by velcro means. D-rings were not used to attach the straps until after May 1980. Initial braces contained no spring mechanism. The spring mechanism was added to assist in regaining extensions so that the quadriceps muscle would not have to be active.

The 3D rehabilitative brace system was intended for use, among other things, after knee ligament repairs, for achievement of knee motion after a total knee replacement, torn anterior cruciate or medial collateral, lateral collateral, posterior cruciate ligament injuries, and fractures in the knee area.

■ Knowledge and usage has been interpreted to mean publicly known and used. Private or secret knowledge or use does not qualify as the type of knowledge or use necessary to invalidate a patent. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.,* 721 F.2d 1540 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

Beginning in the fall semester of 1979, Dr. Richard Jones assisted by Dr. Earl Smith used the leg brace system on football players in the Dallas Independent School District (DISD) football program. These patients had primarily medial collateral ligament and anterior cruciate ligament injuries. The brace system being used did not have the spring mechanism.

Also during the fall of 1979, Drs. Richard Jones and Earl Smith used the 3D brace system on patients at the VA Hospital. From the fall of 1979 through the months of April and May 1980, the leg braces were applied to a group of fifteen osteoarthritic

---

1. The court found Dr. Smith to be a highly credible witness in that he was able to clearly recall events concerning the 3D device and related them to specific events or occurrences. Dr. Smith has nothing to gain or lose by his testimony. He was not a part of 3D nor an inventor of the 3D device.

patients at the VA Hospital who had total knee replacement to study knee flexion/extension with the use of the brace system as well as a comparison to patients not wearing the brace system.

In July 1980, Mrs. Martha Mauldin, the mother of Dr. Donald Mauldin, a patient of Dr. Richard Jones, was operated on and a dynamic knee rehabilitation brace was used in her recovery process. The hospital records reflect a restricted range of motion of zero to ninety degrees was used with this brace.

During a skiing vacation over Presidents' Weekend in February 1980, John Stringfellow tore knee ligaments. The 3D brace was utilized on this patient by Dr. Earl Smith. The patient wore the brace for about six weeks while being monitored by Dr. Smith, who concluded that Stringfellow did very well with his brace, attaining a quicker or better rehabilitation.

Additional prior public use includes documentation of Dr. Earl Smith using a leg brace on a patient named A. Howell on November 6, 1980.

Prior to May of 1980 forty to forty-five braces were made at the request of Drs. Richard Jones and Donald Mauldin in the laboratory established by Melvin Stills.

At the Las Vegas Convention of American Academy of Orthopedic Surgeons held February 26 through March 3, 1981 the 3D team had a commercial booth and a scientific booth; posters prepared by the graphics department of the medical school detailing the results of their clinical study conducted on the patients at the VA Hospital, as well as actual leg brace systems, were displayed. Brochures were available explaining how the braces functioned. Drs. Donald Mauldin, Earl Smith and Richard Jones were available at the booths to answer questions concerning their products.

Dr. Earl Smith testified that Drs. Donald Mauldin and Richard Jones applied the braces to patients in their private practices beginning in the fall of 1979.

The patients in the private practice at the clinic as well as the VA Hospital patients and the DISD football players wore the braces publicly. There was no confidentiality agreement between the doctors and any of the patients who wore the braces. The only confidentiality agreement concerning brace system with the 3D group was the April 15, 1980 secrecy agreement signed with DePuy, when 3D was considering DePuy as a possible manufacturer or licensee of their rehabilitative knee brace system.

Under Section 102(a), "a person shall be entitled to a patent unless the invention was known or used by others in this country ..., before the invention thereof by the applicant for patent."

Bledsoe conceived his invention on or about May 19–20, 1980 as evidenced by the testimony of Bledsoe and Hutson as to the sketches made by Bledsoe while meeting with Ray Harroff at Biomet. The actual reduction to practice was in October of 1980 when Bledsoe himself fabricated a brace.

The 3D rehabilitative brace system was conceived in June of 1979 by Dr. Donald Mauldin after his return to The Southwestern Medical School upon completion of a fellowship in San Francisco, California. This invention was reduced to practice by using the brace system beginning with the 1979 football season in the late summer and fall on injured football players of the member schools of the DISD. Dr. Earl Smith used the 3D brace system on his patient Stringfellow in February 1980 following a skiing accident over President's Weekend. All of these public uses occurred before Bledsoe's invention was even conceived. During the time frame between Bledsoe's conception and reduction to practice, a 3D brace was used on Dr. Mauldin's mother, Martha Mauldin, on July 11, 1980 following her surgery.

Under Section 102(b), "a person shall be entitled to a patent unless the invention was.... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

The '276 utility patent application was filed on January 22, 1981, making the target date for invalidating prior art to have been in public use prior to January 22,

1980. Edward Fiorito, the defendants' expert witness in the areas of engineering and patents, testified the 1979 activities involving the DISD football players, in his expert opinion, would invalidate the '276 patent under this section. Mr. Fiorito relied upon the deposition testimony given by Drs. Donald Mauldin, Richard Jones, Earl Smith and Dr. Donald Mauldin's secretary, Diane Kammeyer.

Under Section 102(g), "a person shall be entitled to a patent unless before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it."

Again the usage by DISD, Stringfellow, Mrs. Mauldin and the VA Hospital study all demonstrate that the 3D device was made and in use before Bledsoe's reduction to practice in October of 1980.

Dr. Drude Faulconer, the plaintiffs' engineering expert witness in the area of patents, testified that if Exhibit 94 is established as prior art and was made with non-elastic straps it anticipates claim 1 and thus in his opinion invalidated claim 1 under 35 U.S.C. § 102a, b, and g. Defendants' trial exhibit 94 is the 3D device with the later added spring mechanism and D-ring means of attaching the circumferential straps which was invented and reduced to practice before the April 15, 1980 confidentiality agreement with DePuy.

*Conclusions as to Invalidity under § 102*

■ Claim 1 is invalid as anticipated under § 102a, b, and g in that each element of claim 1 is disclosed in the 3D invention. While the straps in the 3D invention do not attach directly to the brace element by velcro means, the '276 patent teaches that this element is to more effectively anchor the braces to the leg, not to anchor the braces to the leg.

Claim 2 through 5, dependent claims of claim 1, are each invalid as anticipated under § 102.

Claim 6, a method claim, is invalid as anticipated by the 3D invention under § 102 based upon the method of application described by Dr. Mauldin of the 3D invention, set out in great detail above.

Claim 7, a dependent method claim on claim 6, is invalid as anticipated under § 102.

■ Defendants have not met their burden of proving claim 8 is anticipated by the 3D invention under § 102. The 3D invention does not disclose a separate ankle cuff designed to prevent downward slippage.

OBVIOUSNESS OF THE '276 PATENT

Medical Technology, Inc. and Bledsoe claim the '276 patent is invalid because it was obvious at the time of the invention under 35 U.S.C. § 103.

Section 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described or set forth in section 102 of the title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

■ MTI and Bledsoe have the burden of proving obviousness by clear and convincing evidence. *American Hoist*, 725 F.2d at 1358–59. To be obvious, the claimed invention as a whole must have been obvious to one of ordinary skill at the time of the invention. Obviousness is a question of law based on factual inquiries into: (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) differences between the claimed invention and the prior art, and (4) objective evidence of nonobviousness such as the long-felt need, unexpected results, failure of others, commercial success, and copying. *Akzo N.V.*, 808 F.2d at 1480. MTI and Bledsoe correctly indicate to the court that the 3D device is prior art that was not before the PTO examiner during the prosection of the '276 patent. As discussed above, this affects the deference due that PTO.

*Scope and Content of the Prior Art*

The Court will consider the relevant prior art in existence before May 19–20, 1980, the record date of the conception of Bledsoe's invention. The term "prior art", as it to be applied in 35 U.S.C. § 103, should include all inventions which were made in this country before an application or patentee made his invention, regardless of when those inventions are made public or patent applications on them are filed, so long as those inventions are found not to have been abandoned, suppressed, or concealed. *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430 (Fed.Cir.1988) *cert. denied*, 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988) *citing Kimberly–Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437 (Fed.Cir.1984). Based upon the evidence presented at trial, the court determines that the related prior art includes art in the fields of rehabilitative leg or knee braces and knee immobilizers. The court has selected inventions from each classification of prior art deemed most representative of the available prior art cited by both sides, as well as the PTO in the '276 patent: 3D Rehabilitative Brace; United States Patent No. 3,785,372 (the Craig '372 Patent); United States Patent No. 3,935,858 (the Harroff '858 Patent); and United States Patent No. 4,090,508 (the Gaylord '508 Patent).

*Differences between the Claimed Invention and the Prior Art Knee/Leg Braces*

*The 3D Rehabilitative Brace.* The 3D device has been thoroughly discussed above. 3D is a device designed to provide support to a leg following certain injuries or surgeries while giving the prescribing physician a choice of immobilizing the leg or selecting controlled degrees of motion. The device is removable to allow the physician to observe the healing progress and reapply the same device and adjust it according to the patients treatment needs. The 3D device later added a spring mechanism to assist in regaining extensions so that the quadricep muscles would not have to be active.

*The Craig '372 Patent.* The Craig patent is a hinge appliance which is attached to a patient's leg by using upper and lower casts sections. No velfoam sheath or plurality of circumferential non-elastic straps is disclosed. Because the Craig device uses an upper and lower cast, it cannot be removed to allow the physician to check the healing process and then replaced.

*Knee Immobilizers*

*The Harroff '858 Patent.* The Harroff patent teaches the use of a single sheath wrap-around immobilizer for the knee. It is intended to be easily applied to the wearer. A pair of stays is detachably positioned on the medial and lateral sides of the knee as a means of adjusting to the individual wearer. The function of this device is to immobilize the knee. The invention uses loop and pile material for closure of the sheath. The detachable stays, which have straps attached to them, once affixed to the sheath provide the means for holding the immobilizer to the leg. The invention provides only for immobilization of the knee, not allowing an option of presetting a controlled arc of motion through the use of a hinge.

*The Gaylord, Jr. '508 Patent.* The Gaylord patent describes a knee bracing system which immobilizes the knee. It contains a single flexible sheath which can be adjusted in both length and circumference. Circumferential straps are attached to the rigid stay affixed down the back length of the sheath. This allows for the adjustment of the two rigid stays which are selectively placed along the medial and lateral sides of the wearer's knee. The circumferential straps hold the sheath and the rigid stays in their selected position. The teaching emphasized is the adjustability in the length and circumference. The device does not contain a hinge to provide immobilization or controlled arcs of movement.

*Level of Ordinary Skill in the Art*

The court in determining the level of ordinary skill in the art must consider several factors including: (1) the education level of the inventor, (2) the type of problems encountered in the art, (3) prior art solutions to these problems, (4) the rapidity

with which innovations are made, (5) sophistication of the technology, and (6) education level of active workers in the field. *Environment Designs v. Union Oil Co. of Cal.,* 713 F.2d 693 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

 Based upon the evidence presented at trial, the court determines that a person of ordinary skill in the art at the time of the invention would have a variety of educational backgrounds with hands-on experience in the orthopedic field of at least knee rehabilitation. It is not necessary that such a person have a professional education such as a medical or engineering degree. It was accepted that Bledsoe was a person having ordinary skill in the art even though Bledsoe did not have formal schooling in this area, only hands-on practical experience in the field of orthopedics. However, many skilled in the area are orthopedic doctors or engineers in the orthopedic field.

*Secondary Considerations*

 The court may look to secondary considerations in determining the obviousness of an invention such as long-felt but unresolved need, failed attempts by others, initial skepticism, subsequent praise, commercial success, and copying by others. *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

The evidence showed that since the mid 1970's those involved in the orthopedic field felt a need for a device that could support the leg while offering a choice between immobilizing the knee area or allowing controlled rehabilitative motion in the knee area. The need was also felt for a device which could be easily applied and removed to allow the physician to check the healing process and then reapplied if necessary. Typical cast bracing immobilizes the knee while a sectioned thigh and calf cast brace with a hinge allows uncontrolled motion. However, casts did not compensate for muscles firing and are time consuming to apply. Often patients must have a new cast applied after each examination by their physician to check their progress.

The products made by MDI, MTI, 3D and others in this field have been overwhelmingly accepted and successful as evidence by the number of units sold and the income generated.

*Conclusions as to Obviousness*

 The court concludes there is clear and convincing evidence that the '276 patent, in light of the prior art as a whole and the secondary considerations, would have been obvious to a person having ordinary skill in the art at the time the Bledsoe invention was made. Again the court recognizes the most pertinent prior art, the 3D invention, was not before the PTO. It is apparent from the evidence that the 3D invention was not abandoned, suppressed or concealed.

**ENFORCEABILITY OF THE '276 PATENT**

 For a patent to be rendered unenforceable because of inequitable conduct before the Patent and Trademark Office, Medical Technology and Bledsoe must establish by clear and convincing evidence a material misrepresentation or omission of information and then establish a threshold level of intent on the part of the applicant. *Akzo N.V. v. U.S. Int'l. Trade Comm.,* 808 F.2d at 1481.

 Information is considered material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.

Mr. McHugh testified he received a call from Floyd Hutson on March 9, 1981 informing him that Hutson had just returned from the AAOS trade show in Las Vegas where he observed a Dallas company handing out brochures about a knee brace. On March 18, 1981 McHugh received from Hutson or Bledsoe a copy of the 3D brochure. McHugh determined the brochure did not give sufficient disclosure to constitute a device related to the Medical Designs' '276 patent application. Furthermore, McHugh did not consider the brochure to be prior art because it was undated, was called to his attention after the

filing of the '276 patent application, and did not disclose how the advertised product functioned. However, McHugh did not even inquire of Hutson how he came into possession of the brochure. McHugh testified on cross-examination by Dan Tucker, counsel for MDI:

Q. You have an opportunity to go in and tell the patent office there is another patent pending on a device that looks similar, all be it it may have a fancy hinge, you have that opportunity in—all during the pendency of this Patent Application, didn't you? All you had to do was call this to the attention of the patent office and they would know; isn't that right?

A. I don't know how to do that but if I thought this was indeed prior art, then I suppose I could make inquiry and find out how it is done. I'm still not convinced this is prior art.

Q. You certainly weren't convinced at the time, were you?

A. That's right. I didn't know—That's true.

Q. And you took no steps to call it to the attention of the patent office to let them determine if it was prior art, did you?

A. That's true.

Q. You intended to stick this in your file and you did, didn't you?

A. I did stick it in my file.

Q. And it's a problem now, isn't it?

A. If you say so. I still don't see any date on this thing. I don't know when this was published.

Q. Well, let me tell you what your response to that question was when I asked you. I said "So you made no investigation regarding its prior art effect." Do you recall that question in August of this year? Do you recall that question?

A. It sounds familiar.

Q. Do you recall your answer?

A. No.

Q. This is from page 129 of your August 2 Deposition. "It's dated after the application was filed. It came in my possession through my client but after the Patent Application was filed, so I had no particular reason to suspect that maybe they were doing something prior to the filing date[d] of our application." You went on to tell me one other thing that is very revealing. Do you recall that?

A. No.

Q. "Got enough problems without going out and looking under rocks for others." Do you recall that? "Got enough problems"—

A. Okay.

Q. —"without going and looking under rocks for more."

A. Yes.

Trial Transcript of the Continuation of the Testimony of Charles McHugh, November 11, 1991 pp. 158 line 24-pp. 160 line 19.

McHugh admitted that if the device depicted in the brochure had been made before Bledsoe's invention it would be prior art, and as prior art would be more pertinent than any of the prior art references before the examiner when he examined the patent application. McHugh also agreed the 3D brochure had a wrap which went around the thigh and the calf, that it had braces, a hinge and straps which wrapped around the leg circumferentially, and that not a single prior art reference cited by the patent examiner disclosed each one of the elements. McHugh further testified that if he had come into possession of the brochure before he had filed the patent application he probably would have called it to the attention of the PTO by identifying it as some unknown unsubstantiated brochure, date of origin unknown.

Edward Fiorito testified that if the 3D brochure were more pertinent than any of the prior art before the examiner, then the brochure would be considered material. McHugh filed a disclosure statement subsequent to filing the patent application and prosecuted the '276 patent to its issuance without disclosing this material prior art.

McHugh's conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to

deceive by inaction. *Kingsdown Medical Consultants v. Hollister Inc.*, 863 F.2d 867 (Fed.Cir.1988).

McHugh's exhibited good faith was limited to his initial testimony that he believed the brochure was too vague to be prior art against the patent application. The minimal reasonable action would have been merely to forward the brochure with his office date stamp of March 18, 1991 to the PTO.

*Conclusions as to Enforceability*

■ McHugh's inactions with regard to the 3D brochure indicates an intent to deceive, by omission, the PTO about this material prior art which McHugh himself acknowledged to be more pertinent than any of the prior art before the patent examiner at the time of the patent application. The court finds this inequitable conduct occurred in relation to all the claims set forth in the '276 patent, thus rendering the entire patent unenforceable. *Kingsdown Medical Consultants v. Hollister, Inc.*, 863 F.2d at 877.

*'379 Patent*

■ Medical Designs, Inc. did not prove by a preponderance of the evidence that the Medical Technology's braces infringe, either literally or by the doctrine of equivalents, the '379 design patent. *Lee v. Dayton–Hudson Corp.*, 838 F.2d 1186 (Fed.Cir. 1988).

The test to determine infringement of a design patent is as follows:

> ... if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other. *Gorham Co. v. White*, 81 U.S. 511 (14 Wall.) 511 [20 L.Ed. 731] (1871).

Evidence presented as to the '379 design patent is quite scarce. Dr. William Hyman, plaintiff's expert witness in the area of biomedical engineering, testified how the MDI inventions and alleged infringing devices of MTI, from a technical viewpoint, achieved their goal. Dr. Hyman did testify that the Bledsoe Brace and the Bledsoe II could easily be mistaken for the MDI braces produced under the '379 patent. However, Dr. Hyman also testified that he did not consider himself to be a patent expert and was unsure if he could speak to infringement per se. The court finds that MDI did not meet its burden of proof as to infringement of the '379 design patent.

■ Defendants' MTI and Bledsoe assert that the '379 design patent is invalid and/or unenforceable. A patent is presumed to be valid. 35 U.S.C. § 282. The burden of proof rests on the party challenging validity to prove the facts establishing invalidity by clear and convincing evidence. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed.Cir.1984), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Because de minimis evidence was presented as to invalidity or unenforceability, the '379 design patent remains valid and enforceable.

ATTORNEYS FEES

■ A court may award reasonable attorney fees to the prevailing party in exceptional cases. 35 U.S.C. § 285. Because the statute does not define "exceptional cases" the court must turn to legal interpretations. When the accused infringer prevails, extraordinary circumstances have been found where the patentee committed inequitable conduct in securing the patent or in attempting to enforce it. *PPG Industries, Inc. v. Celanese Polymer Specialties Co.*, 6 U.S.P.Q.2d 1010, 840 F.2d 1565 (Fed. Cir.1988).

■ The court finds this to be an exceptional case under Section 285. The court has already found inequitable conduct to render the '276 patent unenforceable. Additionally, evidence was presented at trial to indicate that Thomas Blow, a previous attorney for Medical Designs, Inc. and a relative of Mrs. Floyd Hutson, was put on notice on or about March 20, 1989 by attorney Alan Lintel of 3D's invention being prior art that anticipates the '276 patent.

The letter from Lintel to Blow contained a detailed legal analysis comparing the 3D device and the '276 patent demonstrating anticipation and thus invalidity. The Court finds MDI and Hutson, in any event, should have been put on notice that the '276 patent was unenforceable within ten days after attorney Lintel's said letter; accordingly Defendants' MTI and Bledsoe should be awarded attorneys' fees from April 1, 1989.

## CONCLUSION

Claims 1–7 of the '276 patent were anticipated under 35 U.S.C. § 102. Claims 1–8 of the '276 patent were obvious under 35 U.S.C. § 103. The entire '276 patent is in the alternative unenforceable because of inequitable conduct. The '379 patent is valid and enforceable. However, Medical Designs, Inc. did not prove that the Medical Technology, Inc. braces infringed the '379 patent. Accordingly, the court hereby declares claims 1–7 of the '276 patent invalid under § 102, claims 1–8 invalid under § 103, and in the alternative claims 1–8 unenforceable. Medical Technology, Inc. and Gary Bledsoe are to be awarded attorneys' fees from April 1, 1989. Medical Technology, Inc. and Gary Bledsoe shall submit affidavits in support of applicable attorney's fees after April 1, 1989 by February 28, 1992.

SIGNED this 3rd day of February, 1992.

## JUDGMENT

The above-numbered cause was tried before United States Magistrate Judge Alex H. McGlinchey, without a jury, by consent of the parties, pursuant to the March 25, 1991 Order of Reference from United States District Judge, David O. Belew, Jr., [Title 28, United States Code, Section 636(c)], and in accordance with the appellate direction of *Archie v. Christian*, 808 F.2d 1132, 1137 (5th Cir.1987). All pre-trial and post-trial pleadings have been filed and considered. The court has also examined all the evidence presented at trial.

The issues having been duly tried and a memorandum opinion having been entered this date,

It is ORDERED and ADJUDGED that:

1. United States Patent Des. 269,379 is valid and enforceable, however, no infringement was proven.

2. Claims 1–7 of United States Patent No. 4,407,276 are invalid under 35 U.S.C. § 102.

3. Claims 1–8 of United States Patent No. 4,407,276 are invalid under 35 U.S.C. § 103.

4. Claims 1–8 of United States Patent No. 4,407,276 are unenforceable.

At the close of the Plaintiff's case in chief, this court granted judgment in favor of defendant, Gary Bledsoe, on all of Plaintiff's claims against Gary Bledsoe individually. The final judgment was signed and filed by the court on November 26, 1991. The entry of said judgment was stayed for purposes of time for perfecting appeal. The stay as to said final judgment is hereby lifted and the time for perfecting appeal on the November 26, 1991 final judgment shall run concurrently with the time for perfecting appeal in this judgment signed this date.

The court hereby retains jurisdiction over this case until a determination is made as to amount of attorneys fees due Medical Technologies, Inc. and Gary Bledsoe.

Any additional relief requested by a party not explicitly granted or denied herein is hereby denied.

IT IS FURTHER ORDERED that the Clerk of the Court shall transmit a true copy of this judgment to all parties.

SIGNED this 3rd day of February, 1992.

## FINAL JUDGMENT AS TO PLAINTIFF'S CLAIMS AGAINST GARY BLEDSOE

Came on to be heard the motion of Defendant, GARY BLEDSOE, for judgment at the end of Plaintiff's case. The Court having reviewed the evidence and having considered the argument of counsel is of the opinion that the motion should be granted and that there is no just cause for delay in the entry of final judgment in

favor of GARY BLEDSOE on all of Plaintiff's claims against GARY BLEDSOE.

IT IS THEREFORE ORDERED that the motion of Defendant, GARY BLEDSOE, for judgment at the end of Plaintiff's case is hereby granted in all things, and final judgment is hereby entered in favor of GARY BLEDSOE and against Plaintiff on all of Plaintiff's claims against GARY BLEDSOE.

IT IS FURTHER ORDERED that Plaintiff shall take nothing on its claims against GARY BLEDSOE.

IT IS FURTHER ORDERED that this order shall have no effect on the counterclaims of GARY BLEDSOE.

IT IS FURTHER ORDERED that the effect, for the purposes of appeal, of the signing by the Court and the entry by the clerk of the Court of the final judgment set forth herein is stayed until such time as the Court signs a final and appealable order with regard to the other causes of action pending between and among the parties to this lawsuit, or until further order of this Court, at which time the clerk of the Court is expressly instructed to enter final judgment for Mr. Bledsoe on Plaintiff's claims against him as set forth herein, so that the time for perfecting appeal on this final judgment will run concurrently with the time for appeal of the other parties and causes of action in this litigation.

Signed this 26th day of November, 1991.

## AGREED JUDGMENT

The parties, through their attorneys, have announced to the Court that they have entered into a Settlement Agreement to dispose of all remaining issues involved in this action and agree to entry of this Agreed Judgment.

It is therefore ORDERED, ADJUDGED and DECREED:

1. The Court has jurisdiction over the parties and the subject matter of this action.

2. Venue is proper in this Court.

3. Medical Technology, Inc. is awarded the sum of $592,044.45 damages from Medical Designs, Inc. and Floyd Hutson.

4. Gary Bledsoe is awarded the amount of $82,183.49 damages from Medical Designs, Inc. and Floyd Hutson.

5. This Agreed Judgment disposes of all matters the Court retained jurisdiction over in the February 3, 1992 Judgment and is in addition to the February 3, 1992 Judgment.

It is so ORDERED, ADJUDGED and DECREED this 27th day of February, 1992.