INNOVATIVE SCUBA CONCEPTS,
INC., Plaintiff,

v.

FEDER INDUSTRIES, INC. d/b/a Scuda
Manufacturing, Defendant.

Civ. A. No. 90–S–1311.

United States District Court,
D. Colorado.

April 21, 1993.

Richard Hanes, Timothy Schutz, Hanes & Schutz, P.C., Colorado Springs, CO, J. Stephen McGuire, Denver, CO, for plaintiff.

Peter Schild, Boulder, CO, Robert Schwartz, Miami, FL, for defendant.

## MEMORANDUM OPINION AND ORDER

SPARR, District Judge.

THIS MATTER came before the court on a suit for patent infringement brought pursuant to 35 U.S.C. § 1 et seq. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a) and personal jurisdiction over the Defendant. Venue is proper pursuant to 28 U.S.C. §§ 1391(c) and 1400(b), in that the Defendant transacts business in Colorado and is therefore deemed to reside in this judicial district. *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574 (Fed.Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991). The Plaintiff alleges that its patent is infringed by five (5) products made by the Defendant. The Plaintiff seeks actual damages, enhanced damages for willful infringement, injunctive relief, prejudgment interest, costs, and attorneys' fees. The Defendant has asserted a counterclaim seeking: (1) declaratory judgment that each claim of the patent is invalid; (2) declaratory judgment that the Defendant has not infringed the patent; and (3) attorneys' fees and costs pursuant to 35 U.S.C. § 285. Having considered all the evidence and arguments presented at trial, the court now makes the following Findings of Fact, Conclusions of Law, and Order.

### I. *Factual Background*

The Plaintiff, Innovative Scuba Concepts, Inc. (ISC), is a Colorado corporation doing business in Colorado Springs, Colorado. ISC has been engaged in the business of manufacturing and wholesaling underwater diving products for several years. The Defendant, Feder Industries, Inc. d/b/a Scuda Manufacturing (Feder), is a Florida corporation located in Miami, Florida. Like ISC, Feder has been engaged in the manufacture and sale of underwater diving products. Mr. Irving Feder is the sole director, officer, and stock holder of the Defendant corporation.

In the fall of 1987, Thomas R. Baker, John C. Polkow, and Glen T. Stoll developed an idea for an adjustable strap for use with underwater diving masks. At that time the conventional mask straps being used in the diving industry were constructed of rubber or silicone. These straps served the basic function of maintaining the face mask in place over a diver's face, but tended to tangle with the diver's hair, were difficult to adjust, and did not float. Baker set out to design and manufacture a strap which would alleviate these problems.

With Mrs. Baker's assistance, Baker and the others developed a prototype strap which consisted of a one-piece neoprene headband formed to fit around the back of the head and extend to each side of the head through the attachment loops on the sides of the face mask. (Exhibit 5A). The inside of the narrower end portions of the headband had a "Velcro" type fastening material to secure the strap to itself after it was passed through the loops on the side of the face mask. The inner side of the center portion of the headband contained a plush fabric for comfort in contacting the back of the diver's head. (See Exhibit 5A).

ISC sold the first prototype strap on May 20, 1988 under the name "Slap Strap." The product was initially successful. However, because the thickness of the end portions of the headband made the strap difficult to pass through the attachment loops on the sides of a face mask, this prototype was abandoned in approximately July of 1988 in favor of a modified Slap Strap (Exhibit 5B) (Figure 1). The modified Slap Strap replaced the headband fully made of neoprene with a headband fitted with ribbon type straps attached to each side of the neoprene, which ribbon type straps contained a hook type Velcro material. (See Exhibit 5B). The inner part of the

headband which contacted the back of the diver's head had a loop type plush material to act in relation with the hook type Velcro material on the side ribbons as a means of adjusting the size of the headband. ISC began marketing the new Slap Strap (Exhibit 5B) in July of 1988 and introduced it at a series of industry trade shows and conventions during the fall of 1988 through early 1989. This modified strap (Exhibit 5B) was immediately successful in the marketplace. ISC ceased all sales or development of the original prototype strap (Exhibit 5A).

The evidence indicated that Defendant Feder first learned of ISC's Slap Strap (Exhibit 5B) at a trade show in Miami, Florida in the fall of 1988, when Mr. Feder either saw or obtained a Slap Strap. Shortly thereafter, Feder designed and began manufacturing similar straps referred to as the "Scuda" (Exhibit 8A) and the "Mask Mate" (Exhibit 9A). Feder first displayed its straps to the diving industry at the Dive Equipment Manufacturers Association (DEMA) convention in Las Vegas, Nevada in January of 1989. That is where ISC first saw Feder's straps. Since that time, Feder has continuously sold its various, continually evolving straps (Exhibits 8A, 9A, D–3, and E–3), including a modified Mask Mate strap introduced in 1990 under the name "Twin Band" (Exhibit 10A). In September of 1991, Feder obtained U.S. Patent No. 5,046,200 (Exhibit M) on the Twin Band (Exhibit 10A).

In February of 1989, ISC contacted Donald A. Kettlestrings, a patent attorney located in Maryland, to discuss obtaining a patent on the Slap Strap. ISC furnished Kettlestrings with a Slap Strap (Exhibit 5B), two Slap Strap advertisements (Exhibits O and R), two catalogs referring to neoprene fabrics (Exhibits P and Q), and two straps manufactured by Feder (Exhibit 8A and Exhibit T). Also in February of 1989, Kettlestrings conducted a patentability search and gave his opinion to ISC regarding the patentability of the Slap Strap. On May 1, 1989, following the patentability search, ISC filed its patent application with the United States Patent and Trademark Office (PTO) (Exhibit E). The original patent application contained seventeen claims. (See Exhibit E). On Decem-

ber 4, 1989, after review by the patent examiner and two amendments to the application, the PTO issued a Notice of Allowance for ISC's patent (Exhibit E, p. 50). On March 27, 1990, U.S. Patent No. 4,910,806 (806 patent) was issued, covering seven claims (Exhibit 1).

## II. Claims for Determination

ISC originally alleged infringement of claims 1 and 4 of the 806 patent (Exhibit 1) under the theories of literal infringement and infringement by the doctrine of equivalents. On February 23, 1993, at the close of ISC's evidence, ISC elected to voluntarily dismiss its claim for infringement of claim 1 of the 806 patent and to proceed solely on its claim for infringement of claim 4. Feder argued that, in the course of discovery and trial preparation, ISC had restricted itself to a literal infringement theory on claim 4. Feder argued that it had relied on that restriction and was unprepared to defend claim 4 under the doctrine of equivalents. The court permitted ISC to proceed on claim 4 both literally and by the doctrine of equivalents. The court offered Feder the option to recess the trial for a few days or weeks in order to allow Feder to adequately prepare a defense against the allegations of infringement of claim 4 under the doctrine of equivalents. Feder consulted with its expert witness and counsel and elected to proceed with the trial as scheduled, apparently believing it could adequately defend ISC's claim for infringement of claim 4 under both literal infringement and the doctrine of equivalents.

A court may and normally should inquire into both validity and infringement. Even if the trial court finds a patent claim invalid, the better practice is to go on to consider infringement to avoid the necessity of a remand should the appellate court reverse the finding of invalidity. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1540–41 (Fed.Cir.1983). A judgment of invalidity binds the patentee as against persons not party to the suit unless the court failed to provide a fair opportunity to litigate the claim. Accordingly, the court must determine whether the Plaintiff has proven literal infringement or infringement by the doctrine

of equivalents of claim 4 of the 806 patent by the five (5) accused devices: the "Scuda" strap (Exhibit 8A), the "Mask Mate" strap (Exhibit 9A), the "Twin Band" (Exhibit 10A), a later Mask Mate strap (Exhibit D–3), and another later Mask Mate strap (Exhibit E–3). The court must also determine whether claim 4 of the 806 patent is invalid.

### III. *Findings of Fact and Conclusions of Law*

#### A. *Patent Infringement*

■ 35 U.S.C. § 271(a) provides that "... whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." In patent cases, the law of the Federal Circuit governs the substantive law to be applied. 28 U.S.C. § 1295. To establish infringement of a patent, every limitation set forth in a claim must be found in an accused product or process exactly or by substantial equivalent. *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 935 (Fed.Cir.1987) (en banc), *cert. denied* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988).

#### 1. Literal Infringement

■ The law of literal infringement requires that the asserted claims be compared with the product accused of infringement. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1481 (Fed.Cir.), *cert. denied*, 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984). Literal infringement requires that the accused device embody every element of the patent claim as properly interpreted. *Mannesmann Demag Corp. v. Engineered Metal Products Co.*, 793 F.2d 1279, 1282 (Fed.Cir. 1986). Analysis of whether a patent claim has been literally infringed requires two inquiries, one legal and one factual: (1) a determination of the scope of the claim as a matter of law, and (2) a factual finding whether the properly construed claim encompasses the accused product. *Texas Instruments v. U.S. International Trade Commission*, 805 F.2d 1558, 1562 (Fed.Cir.1986), *reh'g. denied*, 846 F.2d 1369 (Fed.Cir.1988); *Moeller v. Ionetics, Inc.*, 794 F.2d 653, 656 (Fed.Cir.1986); *Loctite Corp. v. Ultraseal*

*Ltd.*, 781 F.2d 861, 866 (Fed.Cir.1985); *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452–53 (Fed.Cir.1985); *Atlas Powder Co. v. E.I. DuPont de Nemours & Co.*, 750 F.2d 1569, 1579 (Fed.Cir.1984); *McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 671–72 (Fed.Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). Claim interpretation is a question of law and involves a review of the specification, the prosecution history, the claims (including unasserted as well as asserted claims), and, if necessary, other extrinsic evidence, such as expert testimony. *Hormone Research Foundation, Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed.Cir.1990), *cert. dismissed*, —— U.S. ——, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991); *Loctite*, 781 F.2d at 866–67.

#### 2. The Doctrine of Equivalents

■ A determination of no literal infringement does not necessarily end the infringement inquiry. Even if there is no literal infringement, there may be infringement under the doctrine of equivalents. This doctrine provides that an accused product infringes if it performs substantially the same overall function is substantially the same way to yield substantially the same result. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854–856, 94 L.Ed. 1097 (1950); *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1325 (Fed.Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2942, 119 L.Ed.2d 566 (1992); *Hormone Research*, 904 F.2d at 1564; *Pennwalt*, 833 F.2d at 934. A finding of infringement under the doctrine of equivalents is a factual determination. *Malta*, 952 F.2d at 1325, citing *Sun Studs Inc. v. ATA Equip. Leasing Inc.*, 872 F.2d 978, 986 (Fed.Cir.1989); *Intel Corp. v. U.S. International Trade Comm'n*, 946 F.2d 821, 832 (Fed.Cir.1991).

■ In the case of infringement under the doctrine of equivalents, the accused device is compared with the claimed invention as a whole. *Texas Instruments*, 805 F.2d at 1571. It is the entirety of the technology embodied in the accused devices that must be compared with the patent disclosure.

*Texas Instruments,* 805 F.2d at 1570. What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. The prosecution history, the other claims in the patent, expert testimony, the language of the asserted claims, and the pioneer status of the invention may all be considered in addition to the specifications. *Texas Instruments,* 805 F.2d at 1568.

■■■■ Equivalence does not require complete identity for every purpose and in every respect. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. *Graver Tank,* 339 U.S. at 609, 70 S.Ct. at 857. It has long been recognized that the range of permissible equivalents depends upon the extent and nature of the invention, and may be more generously interpreted for a basic invention than for a less dramatic technological advance. *Texas Instruments,* 805 F.2d at 1563 (citations omitted). Although *Graver Tank* articulates the tripartite test of "function, way, and result," it also states that the doctrine of equivalence should not be the prisoner of a rigid formula. 339 U.S. at 609, 70 S.Ct. at 856. The "substantially the same way" prong of the test may be met if an equivalent of a recited limitation has been substituted in the accused device. *Malta,* 952 F.2d at 1325, citing *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.,* 868 F.2d 1251, 1259 (Fed.Civ.1989). If all limitations of the claim are satisfied at least equivalently, then the two devices can be found to work in substantially the same way. *Becton Dickinson and Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 798 (Fed.Cir.1990).

### 3. Claim 4 of the 806 Patent

Claim 4 describes "[A]n adjustable strap for use with a diver's face mask, said strap comprising:

a flexible, resilient headband positively buoyant in fresh water and defining op-posed first, inner and second, outer sides;

first and second flexible ribbon members attached to said headband;

a first elastic fabric attached to and covering substantially all of said first, inner side of said headband for comfortably contacting a diver's head;

means in operative relationship with said ribbon members for adjustably attaching said strap to said face mask wherein said attaching means include hook and loop type fastening material attached to said ribbon members; and

a second elastic fabric attached to said second side of said headband and a third elastic fiber [1] attached to said headband and covering edge surfaces of said headband."

(Exhibit 1).

In the patent application (Exhibit E) and in the 806 patent (Exhibit 1), the preferred embodiment of the invention provided that the hook type fastening material attached to the ribbon members engages the plush portion of the inside center portion of the headband (Exhibit 1, Column 2, line 36). This is clearly a description of the Slap Strap (Exhibit 5B) and is the invention depicted in Figures 3, 4, and 5 of the 806 patent. (See Exhibit 1). The evidence indicates that the Slap Strap (Exhibit 5B) formed the basis for claim 1 of the patent (Exhibit 1, Column 3, line 53). Claim 1, however, is no longer at issue in this litigation, having been abandoned by ISC at the conclusion of its case-in-chief.

The patent also provides for an alternative embodiment of the invention wherein each of the ribbon members at the side of the headband include both hook type material and loop type material (Exhibit 1, Column 2, line 46). In this alternative embodiment, each ribbon member passes through the mask posts and is fastened back to itself instead of fastening to the closed loop pile material on the headband. (See Exhibit 1, Column 2, line 46). The alternative embodiment

---

1. The parties have stipulated that the word "fiber" is a typographical error made by the PTO and should be the word "fabric."

formed the basis for claim 4 of the patent (Exhibit 1, Column 4, line 15), which is the subject of this litigation.

### 4. Infringement of Claim 4

■ The accused Mask Mate type straps (Exhibits 8A, 9A, 10A, D–3, and E–3) do not embody every element of claim 4; therefore, they do not literally infringe claim 4. The court considers several, albeit minor, differences between the accused devices and claim 4: (1) Feder's devices reverse a portion of the ribbon members, (2) the first and second elastic fabrics are identical in Feder's devices, rather than having a first inner and a second outer side, and (3) Feder's straps do not include "a third elastic [fabric] attached to the headband and covering the edge surfaces of said headband;" rather, the edge surfaces of Feder's straps are sewn with thread in an "overlock" type stitch. The court finds sufficient differences between Feder's straps and claim 4 to preclude literal infringement of the 806 patent.

■ However, Feder's five (5) accused devices infringe claim 4 under the doctrine of equivalents. The three insignificant differences found above are not sufficient to preclude infringement under the doctrine of equivalents. Examining the ribbon members, the fabric on the inner and outer sides, and the different edge surfaces of Feder's several straps under the doctrine of equivalents, the court finds that the ribbon members, the inner and outer fabric of the headband, and the sewn edges perform the same function in the same way and yield the same result as the invention claimed in claim 4 of the 806 patent. The ribbon members are flexible and include hook and loop type material to adjustably attach the strap to the diver's face mask. The accused devices can be reversed, rendering either side an inner or an outer side. And the "overlock" type stitch constitutes a loosely woven fabric that is elastic. The Scuda (Exhibit 8A) appropriates all the material features represented in claim 4 of the 806 patent. The Mask Mate (Exhibit 9A) is merely larger and has a different logo. The Twin Band (Exhibit 10A) has split open the headband portion, but is equivalent to the patented invention as a whole. The modified Mask Mate (Exhibit D–3) merely added a short ribbon member, but still performs the same overall function in substantially the same way to yield substantially the same result. The further modified Mask Mate (Exhibit E–3) merely used different colors of thread on the edge. Comparing each of Feder's five (5) straps with the claimed invention as a whole, the court finds Feder's straps (Exhibits 8A, 9A, 10A, D–3, and E–3) are all equivalent in function, way, and result to claim 4 of the 806 patent and all infringe the 806 patent by the doctrine of equivalents. *See Texas Instruments,* 805 F.2d at 1563.

■ The fact that Feder has modified the patented invention to such an extent that it holds a patent (Exhibit M) on the Twin Band (Exhibit 10A) does not change the court's determination of infringement by the doctrine of equivalents. Devices that have been modified to such an extent that the modification may be separately patented may nonetheless infringe the claims of the basic patent. Infringement may be found where the material features of the patent have been appropriated, even when these features have been patentably improved. *Atlas Powder,* 750 F.2d at 1580–81 (citations omitted). Modification of an accused device does not negate infringement when that device has adopted the features of the patent claims or their equivalents. *Texas Instruments,* 805 F.2d at 1563–64 (citations omitted). Infringement cannot be avoided by merely adding additional elements or features or by the fact that the accused device is more efficient or performs additional functions. *Amstar,* 730 F.2d at 1482 (citations omitted). The court finds that all of Feder's straps, including the Twin Band, adopt the elements of claim 4, despite minor modifications, additions, and even improvements. *See Texas Instruments,* 805 F.2d at 1563–64 (citations omitted).

These findings and conclusions assume the validity of ISC's 806 patent.

### B. Defenses To Patent Infringement

■ Four major defenses can preclude enforcement of a patent against an otherwise infringing product. Chisum, *Pat-*

*ents,* § 19.01 (1993). The first major defense is invalidity of the patent. While a duly issued patent is presumed valid, an accused infringer escapes liability by establishing that the invention fails to meet the requirements of patentability. The second major defense is fraudulent or inequitable conduct in the procurement of the patent. A patent applicant owes a duty to the PTO to fully and fairly disclose material information relating to the patentability of an invention. The third major defense is misuse or violation of the antitrust laws. If a patent owner exploits his or her patent in an improper manner by violating the antitrust laws or extending the patent beyond its lawful scope, the courts will withhold any remedy for infringement. The fourth major defense is delay in filing suit resulting in laches or estoppel.

Feder raises two of these defenses. As its first defense to ISC's infringement claims, Feder asserts that the 806 patent is unenforceable because ISC procured the patent through fraudulent and/or inequitable conduct by failing to disclose all the relevant prior art known to ISC. As its second defense, Feder asserts that the 806 patent is invalid because the invention was either anticipated or obvious in view of the prior art.

### 1. Duty of Fair and Full Disclosure

Applicants for a patent owe to the PTO a duty of fair and full disclosure of material information relating to the patentability of the invention in question. Breach of the duty of candor may bar enforcement of an otherwise valid patent. To be guilty of a breach of the duty of candor, the patent applicant must have had some culpable state of mind with respect to a misrepresentation or omission. *Halliburton Co. v. Schlumberger Technology Corp.,* 925 F.2d 1435, 1439 (Fed.Cir.1991). A good faith mistake does not constitute fraud or inequitable conduct. Breach of the duty of candor through fraudulent conduct renders the patent unenforceable and may subject the patent owner to other liabilities.

The party making the charge of fraud or inequitable conduct in the procurement of a patent bears the burden of proof. Fraud or inequitable conduct must be established by clear and convincing evidence. *La-*

*Bounty Manufacturing, Inc. v. U.S. International Trade Comm'n,* 958 F.2d 1066, 1070 (Fed.Cir.1992). Issues relating to fraud and inequitable conduct are questions of fact. *Carella v. Starlight Archery,* 804 F.2d 135, 140 (Fed.Cir.1986). A culpable act of fraud or inequitable conduct in the procurement of a patent may consist of a misrepresentation, a misleading statement, or even an omission. The areas of particular concern are: (1) the statutory oath of inventorship, particularly as it relates to the question of prior public use by the inventor or his assignee; (2) the citation of the known relevant prior art; (3) the use of affidavits concerning the date of invention; and (4) the use of affidavits presenting factual evidence on patentability. Chisum, *Patents,* § 19.03[2].

While deference is due the PTO, its decision to issue a patent is only as good as the evidence it considered. *Structural Rubber Products Co. v. Park Rubber Co.,* 749 F.2d 707, 714 (Fed.Cir.1984), quoting *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1360 (Fed.Cir.1984). An applicant may breach the duty of candor by failing to disclose a specific item of prior art which the applicant knows to be more relevant than the prior art cited and considered by the patent examiner. *True Temper Corp. v. CF & I Steel Corp.,* 601 F.2d 495, 502–05 (10th Cir.1979). Yet, even under the broadest view of the duty to disclose prior art, the applicant does not commit inequitable conduct by failing to cite art of which the applicant has no knowledge or which the applicant believes in good faith to be less relevant than that expressly considered by the PTO. *See Beckman Instruments, Inc. v. Chemtronics, Inc.,* 428 F.2d 555, 566 (5th Cir.1970), *republished at* 439 F.2d 1369 (1970). A misrepresentation or omission must be material in order to constitute fraud or inequitable conduct. *Corona Cord Tire Co. v. Dovan Chemical Corp.,* 276 U.S. 358, 374, 48 S.Ct. 380, 384, 72 L.Ed. 610 (1928). An item of prior art is not material if it is cumulative to or less relevant than other items of prior art that the patent examiner considered. *Engel Industries, Inc. v. Lockformer Co.,* 946 F.2d 1528, 1534 (Fed.Cir.1991); *Halliburton,* 925 F.2d at 1440.

■ Feder's first defense to ISC's infringement claim is that the 806 patent is unenforceable because ISC obtained the patent through fraudulent and/or inequitable conduct by failing to disclose all the relevant prior art known to ISC. Specifically, Feder asserts that ISC failed to disclose a letter dated January 16, 1990 from counsel for Dive N'Surf, Inc., a California entity, indicating that Dive N'Surf had previously manufactured a mask strap product of neoprene with plush material on one side of the headband and a ribbon member of velcro hook material which looped through the dive mask buckle and attached to the plush material of the headband.

Feder's first defense fails for more than one reason. First, the letter authored by counsel for Dive N'Surf (Exhibit D) states that the Dive N'Surf mask strap product is obviously different from ISC's patented product. Second, the letter authored by counsel for Dive N'Surf (Exhibit D) was sent to ISC on May 23, 1990, approximately two months after ISC's 806 patent was issued. Feder presents no evidence of any inequitable conduct, much less of any culpable state of mind. *See Halliburton*, 925 F.2d at 1439. Feder cannot meet its burden of proving by clear and convincing evidence that ISC engaged in fraudulent or inequitable conduct in procuring the 806 patent. *See LaBounty*, 958 F.2d at 1070. Feder's first defense must fail.

### 2. Validity of the Patent

■ 35 U.S.C. § 282 creates a presumption that a patent is valid. The presumption of validity encompasses a presumption of novelty, a presumption of nonobviousness, and a presumption of utility. *Structural Rubber*, 749 F.2d at 714, citing *United States v. Adams*, 383 U.S. 39, 48, 86 S.Ct. 708, 712, 15 L.Ed.2d 572 (1966). The challenger has the burden of proving invalidity by clear and convincing evidence. That burden is permanent and does not change. *Medtronic, Inc. v. Intermedics, Inc.*, 799 F.2d 734, 741 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987); *Atlas Powder*, 750 F.2d at 1580–81. The ultimate determination of patent validity is a question of law. *Norfin, Inc. v. International Business Machines Corp.*, 625 F.2d 357, 364–65 (10th Cir.1980); *Milgo Electronic Corp. v. United Business Communications, Inc.*, 623 F.2d 645, 654 (10th Cir.1980), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980).

Feder's second defense is that the 806 patent is invalid because it was both anticipated and obvious in light of the prior art. Feder argues that numerous prior art references, combined in various ways, anticipated the 806 patent, made the 806 patent obvious, and render the 806 patent invalid. The prior art references raised by Feder include: the Uke patent, U.S. Patent No. 4,112,521 (Exhibit J–2), the Schuler patent, U.S. Patent No. 3,606,648 (Exhibit G–2), the Meistrell patent, U.S. Patent No. 4,692,002 (Exhibit M–2), the Coleman patent, U.S. Patent No. 3,768,100 (Exhibit X–2), the Seet patent, U.S. Patent No. 4,820,036 (Exhibit O–2), the Ward patent, U.S. Patent No. 4,520,509 (Exhibit Y–2), the two Rubatex catalogs referring to neoprene fabrics (Exhibits P and Q), and the two Ocean Realm publications (Exhibits E–2 and F–2). Feder further argues that it invented the product represented by claim 4 of the 806 patent prior to ISC's date of invention, thereby barring issuance of a valid patent. Feder maintains that Baker, Stoll, and Polkow were not the first inventors of the product described in claim 4 of the 806 patent.

### a. The Novelty Requirement

■ 35 U.S.C. § 101 is a general statement of the type of subject matter that is eligible for patent protection "subject to the conditions and requirements of this title." 35 U.S.C. § 101 requires that a patentable invention be "new." The meaning of "new" is defined by three conditions of patentability in 35 U.S.C. § 102. Section 102(a) bars a patent on an invention "known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." Section 102(e) bars a patent on an invention "described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for pat-

ent." Section 102(g) bars a patent on an invention that "before the applicant's invention thereof ... was made in this country by another who had not abandoned, suppressed, or concealed it."[2]

All of the novelty provisions refer to the invention being known, used, patented, described, or made by another prior to the applicant's invention thereof. 35 U.S.C. §§ 102(a), (e), (g). The standard for lack of novelty, that is, for anticipation, is one of strict identity. To anticipate a claim for a patent, a single prior source must contain all its essential elements. *Atlas Powder*, 750 F.2d at 1574. Anticipation cannot be shown by combining more than one reference to show the elements of the claimed invention. *Trilogy Communications, Inc. v. Comm Scope Co.*, 754 F.Supp. 468, 506–07 (W.D.N.C.1990). When more than one reference is required to establish unpatentability of the claimed invention, anticipation under § 102 cannot be found and validity is determined in terms of obviousness under § 103. *Continental Can Company USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1267 (Fed.Cir. 1991). Similarity such as will negate novelty and constitute anticipation is determined by reference to the language of the claim; thus, the inquiry as to anticipation is similar to the inquiry as to literal infringement of a patent. Anticipation is a question of fact. *Atlas Powder*, 750 F.2d at 1573–74.

The novelty requirement is closely related to that of nonobviousness. Novelty acts primarily in a negative manner. If an invention is not new, then the invention is not patentable. That ends the inquiry. But if the invention is new, further inquiry must be made into whether it is "new enough," that is, not obvious to one with ordinary skill in the art. Nonobviousness is distinct from novelty in the sense that an invention may be obvious even though it is not identically disclosed

anywhere in the prior art. Novelty is a liberal test in the sense that it is relatively easy for an inventor through careful definition of his claim to avoid products and processes in the prior art. The requirement of nonobviousness under § 103, for which substantial similarity is not required and for which references can be combined, is more difficult to meet.

#### b. *Obviousness*

Another condition of patentability is that the invention be nonobvious. 35 U.S.C. § 103. A patent should not issue if the differences between the claimed invention and prior art are such that the invention as a whole would have been obvious to one of ordinary skill in the art at the time the invention was made. 35 U.S.C. § 103. *Graham v. John Deere Co.*, 383 U.S. 1, 3, 86 S.Ct. 684, 686, 15 L.Ed.2d 545 (1966); *Swift Agricultural Chemicals Corp. v. Farmland Indus., Inc.*, 674 F.2d 1351, 1356 (10th Cir.), *cert. denied*, 459 U.S. 860, 103 S.Ct. 132, 74 L.Ed.2d 113 (1982); *Lam, Inc. v. Johns–Manville Corp.*, 668 F.2d 462, 469 (10th Cir.), *cert. denied*, 456 U.S. 1007, 102 S.Ct. 2298, 73 L.Ed.2d 1302 (1982); *Central Soya Co. v. Geo. A. Hormel & Co.*, 645 F.2d 847, 849 (10th Cir.1981); *Milgo*, 623 F.2d at 654. Obviousness is a question of law which lends itself to several basic factual inquiries. *Graham*, 383 U.S. at 17–18, 86 S.Ct. at 693–694; *Medtronic*, 799 F.2d at 738; *Intel*, 946 F.2d at 834 ("Obviousness is a question of law based on a series of factual determinations, including (1) the scope and content of the prior art, (2) the differences between the art and the claims at issue, (3) the level of ordinary skill in the art, and (4) any other objective evidence...."). *But see Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc.*, 708 F.2d 1554, 1558–59 (10th Cir.1983).[3]

---

**2.** *The novelty provisions should not be confused with the "statutory bar" or "loss of right" provisions in Section 102. Sections 102(b), 102(c), and 102(d) all relate to events and acts by the inventor or by other persons prior to the date when the inventor applies for a patent. The meaning of a statutory bar is that an inventor of a product or process that may have been new and patentable at the time of invention can lose*

the right to obtain a patent by tardiness in applying for a patent.

**3.** Today, the law of the Federal Circuit governs the substantive law to be applied in patent cases. 28 U.S.C. § 1295. Varying decisions of the regional circuits on the status of obviousness as a question of law or fact have ceased to be other than of historical importance except in situations in which the validity of a patent arises in a case

As to the burden of proof, the Federal Circuit has held that: (1) the burden of persuasion on factual issues relating to obviousness remains on the challenger to a patent, regardless of what prior art was considered by the PTO in issuing the patent, *see Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc*, 908 F.2d 951, 953 (Fed.Cir. 1990); and (2) the burden of persuasion is one of clear and convincing evidence, *see Medtronic*, 799 F.2d at 741. The carrying of the burden may be facilitated in situations in which the challenger relies on important prior art or information that was not considered by the PTO. *See Medical Designs, Inc. v. Medical Technology, Inc.*, 786 F.Supp. 614, 618 (N.D.Tex.1992). The carrying of the burden may be more difficult in situations in which the challenger relies on the same prior art and information considered by the PTO. *Hewlett–Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1467 (Fed.Cir.1990).

### 1) Factual Inquiries

In assessing nonobviousness a court should answer certain factual inquiries: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) the so-called "secondary" considerations, such as long felt need, unexpected results, and commercial success. *Graham*, 383 U.S. at 17, 86 S.Ct. at 693; *Atlas Powder*, 750 F.2d at 1574; *Norfin*, 625 F.2d at 365; *Milgo*, 623 F.2d at 654; *True Temper*, 601 F.2d at 505. After making these factual inquiries, the decision-maker must reach a conclusion as to the obviousness of the claimed invention.

### 2) Scope and Content of the Prior Art

A long-standing problem with the obviousness test of patentability is the determination of the pertinent art in terms of scope. Section 103 does not define what is the "art to which said subject matter pertains" or indicate what standards are to apply in determining pertinence. The pertinent art must be ascertained in order to determine: (1) the relevant prior art, and (2) the person with ordinary skill to whom the

invention must be not obvious in light of the prior art. The trend is to widen the scope of prior art that can be considered pertinent. *Twin Disc, Inc. v. United States*, 10 Cl.Ct. 713, 231 USPQ 417, 427 (Cl.Ct.1986). The Federal Circuit has adopted a two-part test for determining whether particular references are within the appropriate scope of the art. First, it must be determined whether the reference is within the field of the inventor's endeavor. Second, assuming the reference is outside the inventor's field of endeavor, it must be determined whether the reference is reasonably pertinent to the particular problem with which the inventor was involved. *In re Clay*, 966 F.2d 656, 658–59 (Fed.Cir.1992); *In re Deminski*, 796 F.2d 436, 441–42 (Fed.Cir.1986), quoting *Stratoflex*, 713 F.2d at 1535.

### 3) Differences Between the Claims and the Prior Art

In *Graham*, 383 U.S. at 17, 86 S.Ct. at 693, the Supreme Court indicated that in applying the Section 103 condition of nonobviousness, the decision-maker must ascertain the "differences between the prior art and the claims at issue." The decisions on nonobviousness focus on two kinds of "differences." The first is the difference between the claims and the prior art in terms of structure or methodology. The second is the difference between the claims and the prior art in terms of function and advantages, or comparative utility. Chisum, *Intellectual Property: Copyright, Patent and Trademark*, 7–103, 104 (1980). In order to make this assessment of differences, the decision-maker must first construe the patent claims at issue. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1567–68 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). The claimed subject matter as a whole is then compared with the prior art. The problem confronted by the inventor must be considered in determining whether it would have been obvious to combine references in order to solve that problem. *Diversitech Corp. v. Century Steps, Inc.*, 850 F.2d 675, 679 (Fed.Cir.1988).

in which jurisdiction is not founded on 28 U.S.C. § 1338.

### 4) Secondary Considerations

So-called secondary considerations, *e.g.* long felt need, commercial success, commercial acquiescence, and professional approval are always relevant to the question of nonobviousness, but must be examined with great care to determine their actual probative value in a particular case. *Ryko Mfg. Co. v. Nu–Star, Inc.,* 18 USPQ 2d 1047, 1048, 1051, 1990 WL 290148 (D.Minn. 1990), *aff'd* 950 F.2d 714 (Fed.Cir.1991). Providing a solution to a long existing problem is one type of objective evidence useful in making obviousness and nonobviousness determinations. *Windsurfing International, Inc. v. AMF, Inc.,* 782 F.2d 995, 1000 (Fed. Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986). Commercial success is considered relevant to lack of obviousness on the rationale that competitors would have been economically motivated to make the invention sooner if it had been truly obvious. *Minnesota Mining & Manufacturing Co. v. Research Medical, Inc.,* 679 F.Supp. 1037, 1054–55 (D.Utah 1987) (citations omitted). Acquiescence by a substantial portion of the competitors in a market to the validity of a patent—usually through acceptance of a license—has been regarded as evidence supporting patentability. The theory behind commercial acquiescence is that persons would not normally act in a fashion contrary to their economic interests unless convinced of the patent's validity. Chisum, *Patents,* § 5.05[3]. The reaction of experts in the field to the invention upon its initial public appearance has also been given weight in determining patentability. Chisum, *Patents,* § 5.05[4].

### 5) Sources of Prior Art

Section 103 does not expressly define what sources must be looked to as prior art to determine obviousness, but the opening phrase clearly implies that the provisions of Section 102 are to be the guide. The prior art references most often relied upon to show obviousness are those mentioned in Section 102(a) (prior knowledge or use, prior patents, and prior publications). Section 102(e) (description in prior patent application by another that ultimately is granted a patent), Section 102(f) (derivation from another), and Section 102(g) (prior invention) may also be relied upon to show obviousness. These sources are examined to determine what they teach to a person of ordinary skill in the pertinent art as to the obviousness of the invention.

#### i. Prior Publications

Feder cites several patents, two catalogs, and two other publications as prior art rendering the 806 patent obvious. A patent is barred if the invention was "patented or described in a printed publication in this or a foreign country" prior to the applicant's date of invention. 35 U.S.C. § 102(a). Description by a prior publication occurs where the work adequately describes the invention in question and the work qualifies as a "printed publication." The description must enable a person with ordinary skill in the art not only to comprehend the invention but also to make it. *See Paperless Accounting, Inc. v. Bay Area Rapid Transit System,* 804 F.2d 659, 665 (Fed.Cir.1986), *cert. denied,* 480 U.S. 933, 107 S.Ct. 1573, 94 L.Ed.2d 764 (1987) (citations omitted).

The concept of a publication requires that a work be circulated to some extent. Publication includes a book, periodical, or newspaper of general circulation. 1 W. Robinson, *The Law of Patents for Useful Inventions,* §§ 325–27 (1890). Works of less general circulation, such as trade catalogs and conference papers may also constitute publications. *Friction Division Products, Inc. v. E.I. DuPont de Nemours & Co.,* 658 F.Supp. 998, 1008 (D.Del.1987), *aff'd.,* 883 F.2d 1027 (Fed.Cir.1989) (unpublished opinion). Very little circulation or permanency is required if the work is specially directed to those skilled in the art or trade to which the patent in question relates.

#### ii. Prior Knowledge, Use, or Invention

Feder also maintains that it was the first inventor of the product described in claim 4 of the 806 patent. Knowledge, use, or invention of the product or process in question in this country prior to the applicant's date of invention bars issuance of a valid patent. 35 U.S.C. § 102(a), (g). Prior

use must be of the complete product or process actually reduced to practice. The use must be accessible to the public in some minimum sense, but the prior user need not take affirmative steps to publicize the product or process. Chisum, *Patents,* § 3.05[1] (1993). Prior invention of the product or process by another must not have been abandoned, concealed, or suppressed. 35 U.S.C. § 102(g). Priority of invention in both contexts goes to the first person to reduce the subject matter to practice, with one exception: the first to conceive the subject matter in question is the first inventor provided he or she exercised reasonable diligence in reducing to practice from a time just prior to when the first person to reduce to practice entered the field. Chisum, *Patents,* § 3.05[4] (1993).

A general rule in patent law is that the date of invention is presumed to be the date the applicant or patentee files a complete patent application in the PTO disclosing the invention. *Wentworth v. Gulton Indus., Inc.,* 578 F.Supp. 508, 517 n. 9 (N.D.Tex.1982), *aff'd,* 722 F.2d 1253 (5th Cir. 1984) (citations omitted). After a patent issues, an accused infringer may cite a reference with an effective date prior to the patentee's application in order to show lack of novelty or obviousness of the invention and hence the invalidity of the patent. Although a patent is presumed valid and an infringer bears the burden of proving facts showing it to be invalid by clear and convincing evidence, 35 U.S.C. § 282; *Medtronic,* 799 F.2d at 741; *Atlas Powder,* 750 F.2d at 1580–81, the burden then shifts to the patent owner to prove a pre-filing date of invention in order to avoid a cited item of prior art. The burden of proof on the patent owner to prove a pre-filing date of invention is a heavy one. A patentee has the burden of proving, by clear and unequivocal evidence, that the invention was both conceived and reduced to practice before the application date. *Freeman v. Minnesota Mining and Manufacturing Co.,* 693 F.Supp. 134, 145–46 (D.Del. 1988), *aff'd in part, rev'd in part,* 884 F.2d 1398 (Fed.Cir.1989), *cert. denied,* 494 U.S. 1070, 110 S.Ct. 1794, 108 L.Ed.2d 794 (1990) (citations omitted); *Mathis v. Hydro Air Industries, Inc.,* 1 USPQ2d 1513, 1524, 1986

WL 84360 (C.D.Calif.1986), *aff'd on merits,* 818 F.2d 874 (Fed.Cir.1987) (unpublished opinion), *cert. denied,* 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987).

Courts traditionally have been suspicious of claims of prior invention based solely on uncorroborated oral testimony. *Pentech International, Inc. v. Hayduchok,* 18 USPQ2d 1337, 1341, 1990 WL 180579 (S.D.N.Y.1990). The patentee is subject to the corroboration requirement that a prefiling date of invention cannot be established by the inventor's uncorroborated testimony as to the date of invention. *Kardulas v. Florida Mach. Prods. Co.,* 438 F.2d 1118, 1121 (5th Cir. 1971). However, the more "widespread view" is that unsupported oral testimony can be sufficient but must be subjected to close scrutiny, with eight factors to be considered in determining its sufficiency: (1) delay between event and trial; (2) interest of witnesses; (3) contradiction or impeachment; (4) corroboration; (5) witnesses' familiarity with details of alleged prior structure; (6) improbability of prior use considering state of the art; (7) impact of the invention on the industry; and (8) relationship between witness and alleged prior user. *E.I. DuPont de Nemours & Co. v. Berkley & Co.,* 620 F.2d 1247, 1261 n. 20 (8th Cir.1980) (citations omitted).

### c. Anticipation and Obviousness of the 806 Patent

### i. Novelty/Anticipation

The court determines that Feder's anticipation defense must fail. The court finds as a matter of fact that none of Feder's prior art references constitute a single prior source containing all the essential elements of the 806 patent. The 806 patent may have combined references from prior arts, but it created a useful product that was unlike any other single prior source. The court finds that the 806 patent meets the test of "new" as defined by the conditions of patentability in 35 U.S.C. § 102.

### ii. Obviousness in Light of the Prior Art

Neither does the court find the first part of Feder's obviousness defense per-

suasive. Feder has the burden of proving by clear and convincing evidence that the invention claimed by the 806 patent was obvious. 35 U.S.C. § 282; *Medtronic,* 799 F.2d at 741. While some of the particular references cited by Feder are arguably outside ISC's field of endeavor, the court nonetheless examined all of the cited references. Even after considering all the cited references, the court concludes that the prior art did not sufficiently teach the claimed invention to a person with ordinary skill in the art.

Much of the prior art Feder relies upon to challenge the 806 patent was considered by the PTO before issuing the patent to ISC. In terms of functional advantages and comparative utility for the specific problem solved, the invention claimed in the 806 patent is far more specific than and far superior to any of the cited prior art. The invention claimed in the 806 patent succeeded in solving a long-existing problem that had never been specifically addressed by the prior art. The invention claimed in the 806 patent was immediately commercially successful and was acknowledged by experts in the field as innovative and useful. Many of those persons skilled in the art wished they had thought of the invention, as evidenced by the numerous imitations that appeared after the Slap Strap (Exhibit 5B) was publicly introduced. The court cannot conclude that it would have been obvious to combine the prior art references in order to solve the specific problem that was solved by the invention claimed in the 806 patent. The differences between the claimed invention and the prior art are such that the claimed invention as a whole would not have been obvious to one of ordinary skill in the art at the time of the invention. See 35 U.S.C. § 103. Upon careful review of all the factors to be considered in determining, as a matter of law, whether the invention claimed in the 806 patent was obvious in light of the numerous cited prior art references, the court finds and concludes that the scope and content of the prior art did not render the invention claimed in the 806 patent obvious.

### iii. First Inventor

The question that gives the court pause, however, is who was the first inventor of the invention claimed in claim 4 of the 806 patent. The general rule is that the date of invention is presumed to be the date the patentee filed a complete patent application with the PTO. *Wentworth,* 578 F.Supp. at 517 n. 9. In this case, ISC filed its patent application with the PTO on May 1, 1989. (See Exhibit E). Feder has cited its own Scuda strap (Exhibit 8A) as a reference for claim 4 that existed prior to May 1, 1989. The burden shifts to ISC to prove a pre-filing date of invention in order to avoid the cited item of prior art. *Freeman,* 693 F.Supp. at 145–46; *Mathis,* 1 USPQ2d at 1524. ISC now has the burden of proving by clear and convincing evidence that it both conceived of and reduced to practice before May 1, 1989 the invention claimed by claim 4 of the 806 patent. The court must consider certain factors in determining the sufficiency of ISC's evidence of a pre-filing date of invention. See *E.I. DuPont v. Berkley,* 620 F.2d at 1261 n. 20.

According to Kettlestring's deposition testimony, the description of the invention in the patent application was based upon the instructions, the straps, and the other materials received by Kettlestrings from ISC in February of 1989, prior to the patent search (Kettlestrings' Deposition, Exhibit F–3, p. 9, line 13). It is difficult to determine from the evidence exactly what ISC discussed with Kettlestrings because ISC's prior counsel and Kettlestrings asserted the attorney/client privilege on behalf of ISC, precluding Kettlestrings from testifying in his deposition about attorney/client communications, but the evidence sufficiently establishes that Kettlestrings had before him ISC's Slap Strap (Exhibit 5B), two Rubatex catalogs referring to neoprene fabrics (Exhibits P and Q), two advertisements for the Slap Strap (Exhibits O and R), and two straps manufactured by Feder, the Scuda strap and an unmarked strap (Exhibit 8A and Exhibit T).

The evidence indicates that ISC did not send the prototype Slap Strap (Exhibit 5A) to Kettlestrings. And, although both Kettlestrings and Polkow testified that they communicated several times by telephone and letter about the invention (See Exhibit F–3,

pp. 22–29), there is no evidence that ISC discussed the prototype Slap Strap (Exhibit 5A) with Kettlestrings prior to the filing of the patent application. Other than Polkow's testimony, ISC presented no evidence of any other prototypes or production models developed between the prototype Slap Strap (Exhibit 5A) and the improved Slap Strap (Exhibit 5B). ISC presented no evidence, other than Polkow's testimony, of the existence of a prototype or production model that had the heat-bonded ribbon members with hook *and* loop type material as opposed to ribbon members with only hook type material. The court agrees with ISC that its Adjust–A–Strap (Exhibit 6A) has alternately reversed and heat-bonded ribbon members with hook and loop type material that match claim 4, but the Adjust–A–Strap did not appear until sometime in 1991.

Because ISC intended to file a Petition to Make Special with the patent application, ISC did discuss with Kettlestrings its concern that Feder's Scuda straps (Exhibit 8A and Exhibit T) infringed on the claims in their Slap Strap patent application. (See Exhibit E, pp. 23–24, Declaration of Jon C. Polkow, dated 4/26/89). Kettlestrings either did not recall or claimed privilege regarding any specific advice given to him by ISC regarding the alternative embodiment and claim 4 of the invention (Kettlestrings' Deposition, Exhibit F–3, pp. 26–35). However, the alternative embodiment (Exhibit 1, Column 2, line 46) and claim 4 (Exhibit 1, Column 4, line 15) precisely describe the infringing Scuda strap marketed by Feder (Exhibit 8A) which ISC sent to Kettlestrings.

The evidence indicates that claim 1 of the 806 patent (Exhibit 1, Column 3, line 52) and the preferred embodiment of the invention set forth in the patent (Exhibit 1, Column 2, line 36) were written on and describe the Slap Strap (Exhibit 5B), while claim 4 of the 806 patent (Exhibit 1, Column 4, line 15) and the alternative embodiment set forth in the patent (Exhibit 1, Column 2, line 46) were written on and describe Feder's Scuda strap (Exhibit 8A). The court's review of claims 1 and 4 reveals that they cannot both read on the Slap Strap (Exhibit 5B) and Feder's Scuda strap (Exhibit 8A). Claim 1 can only read on the Slap Strap (Exhibit 5B) and claim 4 can only read on Feder's Scuda strap (Exhibit 8A). Claim 4 can also read on ISC's prototype Slap Strap (Exhibit 5A), but the evidence shows that Kettlestrings saw Feder's Scuda strap (Exhibit 8A), while he never saw or knew about the prototype Slap Strap (Exhibit 5A). Therefore, because claim 4 cannot read on the Slap Strap (Exhibit 5B) and because Kettlestrings never knew about the prototype Slap Strap (Exhibit 5A), Kettlestrings had to have drafted claim 4 of the 806 patent by describing the attributes of Feder's Scuda strap (Exhibit 8A). It is apparent from the evidence that Kettlestrings drafted claim 1 of the 806 patent based on the Slap Strap (Exhibit 5B) and drafted claim 4 of the 806 patent based on the infringing product sent to him by ISC, Feder's Scuda strap (Exhibit 8A).

The evidence shows that claim 4 of the 806 patent was written on Feder's Scuda strap (Exhibit 8A) and that ISC applied for the patent on May 1, 1989. (See Exhibit E). The evidence also shows that Feder brought the Scuda strap (Exhibit 8A) to the public at the DEMA convention in January of 1989. ISC presented evidence of its prefiling date of invention by way of Polkow's testimony on rebuttal that ISC worked on an interim production model with heat-bonded ribbon members, temporarily abandoned that model because of production costs, and manufactured the Adjust–A–Strap with these features in 1991. Applying close scrutiny to the inventor's uncorroborated testimony as to the date of invention, the court concludes that ISC has not presented clear and convincing evidence that the invention reflected in claim 4 of the 806 patent was invented and reduced to practice by ISC prior to the May 1, 1989 patent application. Accordingly, the court concludes that ISC is not the first inventor of the invention claimed in claim 4 of the 806 patent. Because ISC was not the first inventor, claim 4 of the 806 patent is invalid pursuant to 35 U.S.C. § 102(g) and cannot be enforced against Feder in this infringement action.

#### d. *Attorneys' Fees*

Based on the above findings and conclusions as to infringement and invalidity of

claim 4 of the 806 patent, the court does not reach the issues of damages, willful infringement, injunctive relief, and prejudgment interest raised by the parties in the complaint and the counterclaim. The final matters to be addressed by the court are the parties' requests for attorneys' fees.

 The court in exceptional cases has discretion to award reasonable attorney fees to the prevailing party pursuant to 35 U.S.C. § 285. *Acoustical Design, Inc. v. Control Electronics Co., Inc.*, 932 F.2d 939, 942 (Fed.Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 185, 116 L.Ed.2d 146 (1991); *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 629 (Fed.Cir.1985), *cert. dismissed*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985). *Lam*, 668 F.2d at 476; *Milgo*, 623 F.2d at 654; *True Temper*, 601 F.2d at 508. Attorneys' fees are awarded to compensate the prevailing party because the losing party's misconduct was so unfair and reckless as to make it unconscionable for the prevailing party to sustain the expense of counsel. *Lam*, 668 F.2d at 476. A case may be deemed exceptional where the infringer's conduct in the marketplace was such as to produce an unnecessary and outcome-certain lawsuit or where the party displayed bad faith in the litigation process. *True Temper*, 601 F.2d at 508; *Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1580 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987).

 To prevail under this fee shifting provision, a party must prove the exceptional character of the case. The quantum of proof required to prove bad faith is clear and convincing evidence. *Cambridge Products, Ltd. v. Penn Nutrients, Inc.*, 962 F.2d 1048, 1050–51 (Fed.Cir.1992), citing *Reactive Metals Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578, 1582 (Fed.Cir.1985). In some cases, a finding of willful infringement alone may be sufficient to support a finding that the case is "exceptional." *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed.Cir.

1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2017, 114 L.Ed.2d 103 (1991); *Kloster Speedsteel*, 793 F.2d at 1580–81; *Kori Corp. v. Wilco Marsh Buggies & Draglines*, 761 F.2d 649, 657 (Fed.Cir.1985), *cert. denied*, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985). In the case of an award to a prevailing patent owner, "exceptional" cases are normally those of willful deliberate infringement by the infringer or bad faith continuation of litigation. *Milgo*, 623 F.2d at 667. In the case of an award to a prevailing accused infringer, "exceptional" cases are normally those of bad faith litigation or those involving fraud or inequitable conduct by the patentee in procuring the patent from the PTO. *Cambridge*, 962 F.2d at 1050–51. The court concludes that neither party in this case can show the exceptional nature of its case such that it would be entitled to attorneys' fees from the opposing party.

Accordingly, IT IS ORDERED:

1. The relief sought in ISC's Complaint is DENIED. The clerk of the court is directed to enter judgment on the complaint in favor of the Defendant, Feder Industries, Inc. d/b/a SCUDA Manufacturing and against Plaintiff, Innovative SCUBA Concepts, Inc.

2. The relief sought in Feder's Counterclaim for Declaratory Judgment is GRANTED IN PART and DENIED IN PART. Claim 4 of the 806 patent is hereby declared invalid. All other relief sought in Feder's Counterclaim for Declaratory Judgment is DENIED. The clerk of the court is directed to enter judgment on the counterclaim as to the validity of claim 4 of the 806 patent in favor of the Defendant, Feder Industries, Inc. d/b/a SCUDA Manufacturing and against Plaintiff, Innovative SCUBA Concepts, Inc. Judgment shall be entered against the Defendant, Feder Industries, Inc. d/b/a SCUDA Manufacturing and in favor of the Plaintiff, Innovative SCUBA Concepts, Inc. on the remainder of the counterclaim.

3. Each party is to bear his, her, or its own fees and costs.